## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RANDAL L. BRAWNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-3030 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

Plaintiff Randal L. Brawner appeals from the denial of his application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively Disability Benefits). 42 U.S.C. §§ 416(I), 423, 1382c. This appeal is brought pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, the Decision of the Defendant Commissioner of Social Security is affirmed.

## <u>STATEMENT OF FACTS</u>

Brawner was born on December 9, 1954. He quit school before completing the tenth grade. Brawner previously worked as a maintenance mechanic, carpenter, farm hand, and concrete form setter. <u>Answer to</u>

Complaint (d/e 6), attached Certified Transcript of Proceedings before the Social Security Administration (R.), at 23, 75, 250-51,253.

On January 28, 2002, Brawner was working on a scaffold when the scaffold collapsed. Brawner fell and broke his left heel. Brawner underwent two surgeries during 2002 to set the fracture. As a result of the fracture and subsequent surgeries, Brawner was diagnosed with post-traumatic and surgical deformity of the left calcaneus with surgical screws and prominent hypertrophic bony spur along the plantar surface of the calcaneus, and paresthesias of the lower extremity. R. 219, 225.

By October 2002, the second surgery was healing. R. 177. Brawner received a prescription for orthotic inserts for his shoes and received the custom inserts on November 26, 2002. At that time, Brawner reported pain in his foot. The treating physician stated in the treatment notes that the condition causing the pain would be permanent "due to the fracture and the surgical intervention; however, I expect that his symptoms should improve with orthotic intervention." R. 176. The treatment notes further stated that Brawner could return to work on November 27, 2002. R. 175.

Brawner stayed off work until early January 2003, approximately eleven and one-half months. Brawner went to work for his brother's

concrete pouring company, Brawner Concrete.  Brawner installed the forms at construction sites into which the concrete was poured.  R. 76-77, 252. Brawner worked for Brawner Concrete during the construction season. Brawner drew unemployment in the winter months.  R. 261-62.

On January 15, 2003, Brawner went back to the doctor due to foot pain.  He was diagnosed with status post-fracture and post-surgery, plantar fasciitis and Morton's neuroma.  He was given Naprosyn and told to continue using the orthotic inserts.  Brawner was referred for a functional evaluation.  The treatment note indicated that he would need physical therapy. R. 173.  Brawner, however, did not go for further evaluation and treatment at that time.  Brawner testified that he did not secure the further treatment because he did not have insurance.  R. 265-66.

On February 13, 2004, Brawner went to see a doctor from Capitol Community Health Center of Springfield, Illinois (CCHC).  CCHC provides free medical care.  Brawner saw the doctor at a homeless shelter.  He went to see the doctor to have his blood pressure checked.  His blood pressure was stable.  R. 202.

Brawner worked for his brother's concrete company until June 2005. Brawner testified at the hearing that has not worked since.  R. 252.

Brawner filed for Disability Benefits on July 17, 2006. He claimed that he became disabled on January 28, 2002, as a result of the fall and fracture. A Disability Report - Field Office dated July 28, 2006, indicated that Brawner engaged in substantial gainful activity from 2002 until June 2005. As a result, Brawner amended his onset date to July 1, 2005. R. 113-14, 131.

On August 10, 2006, Brawner prepared a Work History Report for the Social Security Administration. R. 75-82. Brawner stated that he worked for Brawner Concrete from March 2003 until June 2005. He stated that during this time he worked more than eight hours a day, five to six days per week. R. 75-76.

On August 30, 2006, Dr. Vittal V. Chapa, M.D., performed a consultative examination of Brawner. Dr. Chapa observed that Brawner was able to bear weight on his feet and to ambulate without assistive devices. Brawner, however, could not walk on his heels because of the pain. Dr. Chapa found full range of motion in Brawner's left ankle. Dr. Chapa diagnosed Brawner with status post-fractured left calceneus. R. 204.

On September 14, 2006, Brawner went back to see a doctor from CCHC. He complained of a rash and heel pain. Brawner claimed that the

pain in his foot kept him awake. The treatment notes were handwritten on a treatment note form. The handwriting is largely illegible. The social history section of the treatment note form contained the preprinted question "Drugs?" The preprinted words "marijuana" and "cocaine" were circled next to the question. R. 198. The last page of the treatment note form was entitled "Assessment and Plan." The handwritten notes on that page consist of a list of two numbered items. The first numbered item is largely illegible. The second numbered item is a list of four sub-items. The first sub-item is largely illegible; the second sub-item says "Refer to Dermatology"; the third item says "Cane"; and the fourth sub-item says "Disability Card." R. 200.

Brawner saw doctors from CCHC in May, July and September 2007 for foot pain and stomach problems. At most of these visits, Brawner saw Dr. Sheila Ayorinde, M.D. During these visits, Brawner was diagnosed with gastroesophageal reflux (GERD), left foot pain, and depression. He was prescribed Zantac, Daypro, Lexapro, Zoloft, and Tylenol Arthritis during this period. R. 221-38. An X-ray of the left foot on September 17, 2007, showed post-traumatic and surgical deformity of the left calcaneus with surgical screws, and prominent hypertrophic bony spur along the plantar

surface of the calcaneus.  The old fracture site was still partially visualized in the X-ray.  <u>R.</u> 219.

On October 9, 2007, Brawner went to see Dr. Ayorinde again.  She diagnosed paresthesias of the lower extremities and foot pain.  <u>R.</u> 225.

On May 8, 2008, Dr. Ayorinde completed a form entitled "§ 8:5 Medical statement regarding physical and mental abilities and limitations for Social Security disability claim."  <u>R.</u> 215-16.  Dr. Ayorinde opined on the form that Brawner could not stand for any length of time, but could sit for 30 minutes.  She opined that Brawner could not work at all.  She opined that Brawner could lift ten pounds occasionally and five pounds frequently.  She opined that Brawner could only occasionally bend, stoop, perform manipulations of either hand, and raise his arms above his shoulders.  She opined that Brawner needed to elevate his legs for most of the time during an eight-hour workday.  <u>R.</u> 215.

The Administrative Law Judge (ALJ) conducted an evidentiary hearing on August 21, 2008.  <u>R.</u> 242-82.  Brawner appeared with his attorney.  Brawner and vocational expert Bonnie Gladden testified at the hearing.  Brawner testified that he lived with his wife in an apartment.  His five adult children no longer lived with them.  <u>R.</u> 248.  Brawner testified that the

apartment building had an elevator. Brawner testified that he lived six or seven blocks from the location of the hearing and rode a three-wheel scooter to the hearing. The scooter belonged to his wife who is disabled. He stated that he borrowed the scooter occasionally to make short trips. R. 248-49.

Brawner testified that he quit working in June 2005 because of the pain in his feet:

> Because my feet were bothering me really bad. You work in a lot of mud and gravel and uneven ground, and having to climb up and down off the side of these concrete forms, I just, I got to where I couldn't take it no more.

R. 252.

The ALJ asked Brawner if he tried to find work thereafter. Brawner testified that he tried to find other work, but could not:

> Yeah, anything I could try to, everybody wants to, either a high school diploma, and I wasn't qualified 99 percent of it, even if I would have had a diploma because I don't really know, you know, working on little things. I couldn't, just sitting somewhere just, it bothers me just sitting. I get real stiff. I hurt, . . . .

R. 252. The ALJ asked Brawner if he put in job applications for work, Brawner replied:

> Actually, I just, I checked through the computer. I never, I talked to a couple of different people, but I can't remember who they were. Everybody in the, in their, they give stipulations

what they wanted and what they needed, and 99 percent of them said you had to have a high school diploma or a certain amount of experience, and I had no experience in anything that I looked at that I possibly might have been able to [do].

R. 252-53.

The ALJ asked Brawner to describe a typical day since he stopped working. Brawner testified that he lay in bed and watched television for three to four hours at a time. He then would get up and move around, and then return to bed to watch more television. Brawner testified that his foot would swell. He also stated that his toes went numb while he lay in bed. R. 254-55.

Brawner testified that he did most of the cooking. He stated that he sat on a stool to cook. A friend helped him with the laundry. He did the grocery shopping. R. 255-56. He testified that he used his wife's scooter to go to the grocery store to do the shopping. R. 259. His wife did the vacuuming, mopping and sweeping. R. 255-56. Brawner let his driver's licence expire because he could not afford the insurance. R. 256. Brawner took care of his own personal hygiene. Brawner denied using marijuana or other illegal drugs. R. 257.

The ALJ asked Brawner if he could perform a job in which he could sit

or stand as needed.  Brawner replied:

> Well, I can't, I wouldn't be able to stand, and it's hard for me sitting very long, and I can't do any lifting.  I got a hernia.  There's a bone spur on the bottom of my heel where it makes it very rough to try to walk.

R. 258.  Brawner testified that he could sit for half an hour and stand for five to ten minutes.  R. 258-59.  Brawner stated that he was not supposed to lift more than ten pounds or five pounds continuously.  R. 259.

In response to questions from his attorney, Brawner testified that he regularly took one to two days off per week when he worked for Brawner Concrete from 2003 to 2005.  He testified that he would work a full forty-hour week for one week and then take two or three days off the next week.  R. 262-63.

Brawner testified that he did not go to see a doctor for thirteen months, beginning in January 2003, because he did not have health insurance.  In February 2004, he found out about the free health care offered at the homeless shelter by doctors from CCHC.  He did not often go to the doctor at the homeless shelter because of the distance.  He testified that he started using a cane which made it easier to go to the homeless shelter, but he then also learned that Dr. Ayorinde from CCHC

provided services at a nearby Salvation Army facility.

> Where I had to go to get the help, sometimes you could get in and sometimes you couldn't. I had no transportation. So I had to try to get over there as best way I could. It would take me 40 minutes to make a ten-minute walk that I used to be able to make, and I just, you know, I, I got to where, and finally I got a cane to where it helped me somewhat, and I was able to get over there a little bit easier, and then I found out that they go to the Salvation Army which is a few blocks from where I live at.

R. 266.

Brawner testified that he started seeing Dr. Ayorinde at a Salvation Army in 2006. R. 266. He testified that the CCHC doctors did not prescribed narcotic pain medication because of the problem of drug use with the people in the homeless shelter and at the Salvation Army facility. R. 269. Brawner testified that anti-inflammatory medication bothered his stomach. R. 269-70.

Vocational expert Gladden then testified. The ALJ asked Gladden the following question:

> Okay. . . . I want you to assume if you would a hypothetical person of the age of 53 with nine years education, the past relevant work same as the claimant. I want to ask you to assume that this person is capable of medium work with the following limitations. I would want no job where he would be required to stand all day. There's no problems with, I don't think, I don't find anything here with being able to stand or to walk occasionally, but I wouldn't want him standing or walking

all day.  So a job where he would be primarily sitting.  Not a job standing on the line, you know, or a concrete floor.  I'm going to give him an occasional on, well, never ladders, ropes, or scaffolding and only occasionally climbing; no unprotected heights.  I believe that's all the limitations that I'm seeing that are supported by the record.  So with those limitations, could he return to prior work?

R. 272.  Gladden opined that such a person could not return to Brawner's prior work.  R. 273.  Gladden opined that the person could perform other jobs, including order filler or order clerk, gate tender, parking lot attendant, light construction labor, and cashier.  Gladden testified that the cashier job was light to sedentary work.  Gladden opined that there were 7,000 cashier jobs in Illinois at the sedentary level, and 25,000 such jobs in Illinois at the light exertional level.  R. 274-75.

Upon examination by Brawner's attorney, Gladden testified that employers would not tolerate more than two to three unexcused absences per month. R. 276-77.  Gladden stated that the use of a cane by the person would affect the ability of the person to perform light construction labor, but would not affect his ability to perform the jobs in which the person sat most of the time.  R. 278.  Gladden also testified from her personal observations that parking lot attendants and gate keepers sit most of the time. R. 280-81.

The ALJ issued her Decision on September 11, 2008. The ALJ followed the five-step analysis set forth in the Social Security Administration regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education, and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). Such severe impairments are set forth in the Listings. 20 C.F.R. Part 404 Subpart P, Appendix 1. The claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the ALJ to determine whether the claimant is able to return to his prior work considering his residual functional capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R.

§§ 404.1520(f), 416.920(f).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Brawner met his burden at Steps 1 and 2.  He had not engaged in substantial gainful activity since June 9, 2005, and had severe impairments resulting from a fracture in his left foot and hip pain.  R. 16.  The ALJ found at Step 3 that Brawner's impairments did not meet any Listing.  R. 17.

At Step 4, the ALJ found that Brawner had the RFC to perform light work subject to the additional limitations that he could not perform any job that required standing or walking all day; he could never climb ladders, ropes or scaffolds, or work at unprotected heights; and he could perform only occasional climbing, of ramps and stairs.  R. 18.  In reaching this conclusion, the ALJ relied on Dr. Chapa's examination; Brawner's testimony that he took care of his personal hygiene and did the cooking, laundry and grocery shopping; and evidence that Brawner did not take any narcotic pain

medication.  R. 18-19.  The ALJ found that Brawner's testimony regarding the severity of his pain and functional limitations was not credible given the other evidence.  The ALJ also noted that Brawner had used marijuana in the past and that such use reflected poorly on his credibility.  R. 19.

The ALJ did not give significant weight to Dr. Ayorinde's May 8, 2008, opinions because Dr. Ayorinde did not cite any objective medical findings to support her opinion, Brawner sought very little treatment for his foot since 2005, Dr. Ayorinde's treatment notes did not reflect any significant loss of motion, there was no evidence of muscle atrophy, swelling or neurologic deficits, and Brawner did not even take over-the-counter pain medication.  R. 19.

Having determined Brawner's RFC, the ALJ found at Step 4 that Brawner could not return to his past work.  R. 19.  The ALJ, however, found at Step 5 that Brawner could perform a significant number of jobs in the national economy.  The ALJ relied on Gladden's opinions and the Medical-Vocational Guidelines.  20 C.F.R. Part 404, Subpart P, Appendix 2.  Based on Gladden's testimony, the ALJ found that Brawner could perform the jobs of parking lot attendant, cashier II and light construction labor.  R. 20.  The ALJ found that Gladden's testimony was consistent with the definitions in

the Department of Labor's <u>Dictionary of Occupational Titles (DOT)</u>. <u>R.</u> 20. Because the Commissioner met his burden at Step 5, the ALJ concluded that Brawner was not disabled.

Brawner appealed. The Appeals Council denied Brawner's request for review on December 2, 2009. Brawner then filed this action.

<u>ANALYSIS</u>

This Court reviews the ALJ's Decision to determine whether it is supported by substantial evidence. Substantial evidence is, "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). This Court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ. <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986). The ALJ further must articulate at least minimally her analysis of all relevant evidence. <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994). The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence. <u>Diaz v. Chater</u>, 55 F.3d 300, 308 (7th Cir. 1995).

In this case, the ALJ's decision is supported by substantial evidence, although she did engage in some harmless error. The RFC finding is

supported by Dr. Chapa's report. The finding at Step 5 is supported by Gladden's testimony that the person with Brawner's RFC, education, and past work experience could perform 7,000 sedentary and 11,000 light cashier jobs that exist in Illinois. The evidence concerning whether Brawner could perform light construction and parking lot attendant jobs was unclear at best, and so, would not support the ALJ's findings that Brawner could perform those jobs without further explanation. Gladden's opinions about the cashier jobs, however, was clear and proof that Brawner can perform 17,000 jobs in Illinois is sufficient to meet the Commissioner's burden at Step 5. See e.g., Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009) (the availability of 1,000 jobs is significant).

Brawner argues that the ALJ erred in refusing to give controlling weight to the opinions of Brawner's treating physician, Dr. Ayorinde. A treating physician's medical opinion is entitled to controlling weight when it is well supported by medically acceptable clinical and diagnostic techniques and is reasonably consistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Brawner argues that Dr. Ayorinde prescribed the use of a cane, but the ALJ failed to consider the use of the cane in determining the RFC or in formulating her questions to

Gladden. The evidence in the record that Dr. Ayorinde prescribed a cane is ambiguous at best. Brawner submitted one treatment record dated September 14, 2006, in which the word "cane" is written. That is all the evidence of a prescription. That one word on a treatment record is ambiguous. The statement could mean that Dr. Ayorinde prescribed a cane, or it could mean that Brawner told Dr. Ayorinde that he was using a cane. The same list of items contains the word "Disability Card" under "Cane." R. 200. Clearly Dr. Ayorinde did not prescribe a disability card. The evidence from the treatment note, thus, is unclear.

Brawner's testimony about the cane supports the inference that the cane was not prescribed. Brawner testified that he got the cane before he learned that he could see Dr. Ayorinde at the Salvation Army. R. 266. He then testified that his visits with Dr. Ayorinde in 2006 happened at the Salvation Army. R. 266. This testimony supports the inference that Brawner used the cane before he saw Dr. Ayorinde on September 14, 2006. If so, then the use of the cane was not prescribed by his treating physician. The note on the plan section of the September 14, 2006, treatment note merely reflected the fact that Brawner was using a cane, just as the same list of items reflected that Brawner was seeking a "Disability Card." Brawner's

testimony provides substantial evidence to support the inference that Dr. Ayorinde did not prescribe the use of a cane.[1] The ALJ, therefore, did not err in relying on Dr. Chapa's finding that Brawner could ambulate without a cane.

Brawner also complains that the ALJ erred in refusing to give controlling authority to Dr. Ayorinde's May 8, 2008, opinions that Brawner could not stand at all, could not work at all, and needed to have his feet elevated most of the day. The ALJ rejected these opinions because they were not supported by objective medical findings. The Court agrees. The severity of Brawner's impairments turns almost entirely on his subjective level of pain. He suffered a serious fracture and has deformities in his left foot as a result. Those deformities cause pain. The objective medical evidence supports these conclusions. The level of pain, however, determines the limitations on his ability to sit, stand, and walk, and the necessity of elevating his legs. The evidence on the level of pain is purely subjective. As such, Dr. Ayorinde's opinions on his limitations are not based on objective medical findings, but on Brawner's reports of pain. Dr. Ayorinde's opinions

---

[1]Brawner's attorney later formulated a question in which the attorney asserted that the cane was prescribed. R. 268. The attorney's assertion is not evidence.

are also inconsistent with Dr. Chapa's observation.[2]  The ALJ, therefore, was not required to give Dr. Ayorinde's opinions controlling authority.

Brawner argues that the ALJ erred in her RFC finding because she did not take into account the fact that Brawner testified that during the period that he worked at Brawner Concrete from 2003 to 2005, he took off two to three days every other week.  Brawner argues that the ALJ should have included in the RFC and in her hypothetical question to Gladden a requirement of frequent unscheduled days off.  The Court disagrees. Brawner stated at the hearing that he took off two to three days every other week, but he stated in his Work History Report that he worked more than eight hours per day, five to six days per week, for Brawner Concrete.  The Work History Report provides substantial evidence for the ALJ's decision to discount Brawner's claim that he regularly took unscheduled days off at Brawner Concrete.

Brawner also argues that the ALJ erred in making her credibility findings.  The Court will not review the credibility determinations of the

---

[2]The Court notes that Dr. Ayorinde seems to have overstated Brawner's impairments in other respects.  Dr. Ayorinde opined that Brawner was limited to occasional manipulations with his hands and occasional raising of his arms.  R. 215.  No evidence indicates any limitation in Brawner's use of his upper extremities or his ability to manipulate his hands.

ALJ unless the determinations lack any explanation or support in the record. Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008). Dr. Chapa's findings support the ALJ's determination that Brawner's testimony was not credible as to the severity of his symptoms. The ALJ's finding is also supported by the fact that Brawner does not use narcotic or even anti-inflammatory pain relievers. The record further shows a lack of credibility in other areas. Brawner gave inconsistent statements on at least two matters. He stated in his Work History Report that he worked five to six days a week at Brawner Concrete, but he testified at the hearing that he took two to three days off every other week. He indicated to his doctor on September 14, 2006, that he used marijuana, but denied the use of marijuana at the evidentiary hearing. These inconsistencies support a finding of a lack of credibility. The Court will not disturb the ALJ's credibility finding.

Last, Brawner argues that the ALJ erred because she failed to question Gladden regarding inconsistencies between her testimony and the definitions in the DOT. An ALJ must obtain an explanation from a vocational expert when there is an apparent conflict between the expert's testimony and the definitions in the DOT. SSR 00-4p. The Court agrees that Brawner's attorney's examination of Gladden raised questions regarding

whether the hypothetical person with Brawner's RFC could perform the jobs of light construction and parking lot attendant as defined in the DOT. <u>Plaintiff's Memorandum in Support of Summary Judgment or Remand (d/e 9)</u>, at 14-17, and authorities cited therein. The error, however, was harmless because Gladden also opined that Brawner could perform 7,000 sedentary and 11,000 light cashier jobs in Illinois. Brawner makes no claim that her opinions regarding the cashier jobs conflict with definitions in the DOT. The existence of these 18,000 jobs in Illinois is sufficient to meet the Commissioner's burden at Step 5. <u>Liskowitz</u>, 559 F.3d at 743. The error, therefore, was harmless. <u>See</u> <u>Keys v. Barnhart</u>, 347 F.3d 990, 994 (7th Cir. 2003).

THEREFORE, the Defendant Commissioner's Motion for Summary Affirmance (d/e 11) is ALLOWED, and the Plaintiff's Motion for Summary Judgment or Remand (d/e 8) is DENIED. The Decision of the Commissioner is affirmed. All pending motions are denied as moot. This case is closed.

ENTERED this 30th day of September, 2010

s/ Michael P. McCuskey
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE